IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PINEDA REO, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| WEIR BROS, INC., | § | |
| | § | |
| Debtor, | § | |
| | § | |
| AECOM HUNT a/k/a HUNT | § | |
| CONSTRUCTION GROUP, INC., | § | |
| | § | Civil Action No. 3:18-CV-1660-N |
| Garnishee and Counterclaimant/ | § | |
| Interpleader, | § | |
| | § | |
| v. | § | |
| | § | |
| PINEDA REO, LLC; BERKLEY | § | |
| REGIONAL INSURANCE COMPANY; | § | |
| UNITED STATES OF AMERICA; WEIR | § | |
| BROS. CONTRACTING, LLC; and AL | § | |
| WEIR, AS TRUSTEE FOR WEIR | § | |
| LIQUIDATING TRUST, | § | |
| | § | |
| Interpleader Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This Order addresses Interpleader Defendant Berkley Regional Insurance

Company's ("Berkley") motion for summary judgment [21], Interpleader Defendant

United States of America's ("IRS")[1] motion for summary judgment [24], Plaintiff Pineda

---

[1] While the IRS is represented by the United States in this action, the Court refers to this party as the IRS because the IRS assessed Weir Bros., Inc.'s unpaid taxes and filed the federal tax lien at issue in this case.

REO, LLC's ("Pineda") motion for summary judgment [27], Garnishee AECOM Hunt a/k/a Hunt Construction Group, Inc.'s ("Hunt") motion for summary judgment [30], and Interpleader Defendants Weir Bros. Contracting, LLC and Al Weir, as trustee for Weir Liquidating Trust's, (collectively, " the Weir Group") motion for summary judgment [33]. For the reasons below, the Court grants Pineda's and the IRS's motions for summary judgment, denies Berkley's and the Weir Group's motions for summary judgment, and grants in part and denies in part Hunt's motion for summary judgment.

## I. THE PRIORITY DISPUTE

This dispute arose among creditors of Weir Bros., Inc. ("Weir Bros."), a subcontractor, as to priority over the funds interpled in a state garnishment action Pineda initiated in Texas state court. The interpled funds are comprised of retainage and withheld payments originally held by Hunt, the garnishee, for services rendered by Weir Bros. on a construction contract awarded to it by Hunt.

Pineda's claim to the funds has its genesis in a security agreement executed by Pineda's predecessor-in-interest, Compass Bank ("the Bank"), and Weir Bros. In August 2008, Weir Bros. entered a Revolving Credit and Security Agreement ("the Agreement") with the Bank. Pineda's Mot. Summary Judgment Brief 2 [28]. The Agreement provided a revolving line of credit to Weir Bros. up to $4,000,000.00, which was secured by Weir Bros.'s grant of a security interest in all its after-acquired accounts receivable. *Id.* at 2–3. The Agreement provided that the collateral secured Weir Bros.'s payment on any funds lent under the Agreement and its performance under the accompanying promissory note to

the Bank and its assignees. *Id.* at 3–4. The Bank perfected its security interest on October 9, 2008, by filing a UCC-1 financing statement with the Texas Secretary of State. *Id.* at 4.

When Weir Bros.'s loan to the Bank became due in May 2012, Weir Bros. defaulted on its debt, which exceeded $5,000,000.00. *Id.* at 4–6. Subsequently, the Bank assigned its interest in the Agreement and the promissory note to Pineda Grantor Trust II in November 2012; these interests were assigned to a number of Pineda entities over the next three years. *Id.* at 6. The Pineda parties amended the UCC filing statement each time the interests were transferred and continued the filing. *Id.* at 6–7. In May 2015, Pineda NPL-F2, LLC assigned the interest to Pineda REO, LLC, the current owner of the documents and security interest. *Id.* at 6. In November 2017, after Pineda discovered that Hunt was holding $273,716.25 in retainage and undistributed progress payments for Weir Bros.' work on a contract, Pineda filed a garnishment writ seeking the funds from Hunt. *Id.* at 1. Hunt filed a crossclaim for interpleader and deposited $273,716.23 into the court registry.

Berkley was interpleaded by Hunt and lays claim to the funds for losses it incurred from Weir Bros.'s defaults on construction contracts. In December 2009, Weir Bros. and other Weir entities executed and delivered to Berkley a General Indemnity Agreement ("GIA"). Berkley's Mot. Summary Judgment Brief 3 [22]. The GIA grants Berkley a security interest in Weir Bros.'s accounts receivable to secure surety performance and payment bonds to cover Weir Bros.'s construction contracts. Berkley's Mot. Summary Judgment Appx., Ex. A 6–7 [23]. Section VII of the GIA also provides in part that "all funds due or to become due under any Contract covered by a Bond are Trust Funds, whether in the possession of an Indemnitor or another . . . for the benefit of Surety (Berkley)

for any liability or loss it may sustain or incur by reason of or in consequence of the execution of such Bonds." Berkley's Mot. Summary Judgment Brief 3–4 [22].

Subsequently, Berkley issued several bonds for construction contracts Weir Bros. acquired, including a May 2011 bond for a subcontract Hunt awarded to Weir Bros. for work on the University Hospital for the University of Texas Southwestern Medical Center at Dallas ("University Hospital"). *Id.* at 4. Weir Bros., however, failed to complete several of its contracts, and Berkley was required to pay for the completion of the contracts its bonds covered to the tune of $4,615,934.70. *Id.* at 5. When Weir failed to indemnify Berkley for these losses, Berkley filed suit against Weir and procured a judgment in November 2013, which remains outstanding. *Id.* at 6.

Hunt also added the United States as a party to this action due to a December 10, 2012, tax lien the IRS had filed against Weir for unpaid taxes assessed between August 2011 and July 2012.[2] U.S' Mot. Summay Judgment Brief 5 [25]. Lastly, Weir Contracting, LLC and Al Weir, as trustee for the Weir Liquidating Trust, (collectively, the "Weir Group") intervened in the proceeding. The Weir Group claims that Weir Contracting, LLC ("Contracting") purchased all Weir Bros.'s assets pursuant to an Asset Purchase Agreement ("Purchase Agreement") executed on December 4, 2013. Weir Group's Mot. Summary Judgment Brief 2 [34]. In exchange for Weir Bros.'s assets, Contracting agreed to complete Weir Bros.'s pending construction projects and remit retainages collected to a

---

[2] The IRS filed multiple tax liens against Weir, but the earliest was filed on December 10, 2012, in the amount of $901,101.24. U.S' Mot. Summary Judgment Brief 5–6 [25]. Because this lien exceeds the amount of interpled funds at issue in this case, the filing dates and amounts of subsequent IRS tax liens are irrelevant.

liquidating trust, created on the same date as the Purchase Agreement, for the benefit of Weir Bros.'s creditors. *Id.* at 2–3. Following the Weir Group's intervention, the IRS removed the case to this Court, and the parties each filed a motion for summary judgment.

## II. SUMMARY JUDGMENT LEGAL STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made the required showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. THE COURT GRANTS THE IRS'S AND PINEDA'S
### MOTIONS FOR SUMMARY JUDGMENT

The Court finds that Weir Bros. had rights to the contract proceeds in question,

that the IRS has a perfected federal tax lien and Pineda has a perfected security interest in

those proceeds, and that both the IRS and Pineda have priority to a portion of the funds.

Accordingly, the Court grants the IRS's and Pineda's motions for summary judgment.

#### A. *The IRS's Tax Lien Has Priority in $139,653.00 of the Interpled Funds*

The IRS claims, and Pineda agrees, that the IRS's 2012 tax lien has priority to

$139,653.00 of the interpled funds. For this claim to succeed, the IRS must show that the

debtor, Weir Bros., has ownership rights to the claimed property and that the property is

eligible for tax lien attachment, that the IRS perfected its tax lien by properly filing notice,

and that no other party has a superior interest in the claimed property. The Court finds that

the IRS has carried its burden as to each of these prerequisites.

To determine whether a debtor possesses property eligible for federal tax lien

attachment, federal courts engage in a two-step inquiry. Courts first look to state law to

determine whether a debtor has rights to "property" as defined by state law. *United States*

*v. Craft*, 535 U.S. 274, 275 (2002) ("The federal statute creates no property rights but

merely attaches consequences, federally defined, to rights created under state law.")

(internal quotation marks omitted). If state law recognizes property rights, the courts then

must assess whether under the federal tax code the debtor's "state-delineated rights qualify

as 'property' or 'rights to property'" to which a federal tax lien may attach. *Id.*; *City of*

*Galveston v. Consol. Concepts, Inc.*, 274 F. Supp. 3d 687, 691 (S.D. Tex. 2017). Here,

Texas law provides that a debtor does not have property rights in an "account" [3] until it exists. *See* Tex. Bus. & Comm. Code § 9.204(a), cmt. 2 (permitting a debtor to grant a security interest in after-acquired property, such as accounts receivable, but stating that the creditor's interest automatically attaches only upon the debtor's acquisition of those assets); *Tex. Oil & Gas Corp. v. United States*, 466 F.2d 1047, 1050 (5th Cir. 1972). The Fifth Circuit has identified the time that an account, or an account receivable,[4] comes into existence as the point when "services were rendered and the debt became owing." *Tex. Oil & Gas Corp.*, 466 F.2d at 1050.

Under this definition, Weir Bros. has property rights to the account receivable generated under the Hunt contract because it rendered services to Hunt and is owed the withheld payments and retainage in compensation for those services.[5] *See* Hunt's First Am. Interpleader Petition 1–4 [1.2] (asserting Weir Bros. completed its work under its

---

[3] The Court holds, and none of the parties suggest otherwise, that the retainage and payment receivables held by Hunt for construction services rendered by Weir Bros. constitute an "account" under Texas law, which defines an "account" as "a right to payment of a monetary obligation, whether or not earned by performance . . . for services rendered or to be rendered." Tex. Bus. & Comm. Code § 9.102(a)(iii).

[4] While Texas's codification of the UCC does not specifically define "account receivable," the Fifth Circuit has noted that Texas law appears to treat "accounts" and "accounts receivable" interchangeably and that "[b]oth terms contemplate rights for services rendered by the debtor that create a debt owing to the debtor by another party." *Tex. Oil & Gas Corp.*, 466 F.2d at 1050 (internal quotation marks omitted).

[5] Berkley suggests that Hunt claims the withheld funds are not owed to Weir Bros. Hunt's answer to the garnishment writ, however, merely acknowledge that Hunt does not know which party has the ultimate rights to the interpled funds — Weir Bros., the Weir Group, Pineda, Berkley, or the IRS. Hunt Mot. Summary Judgment Appx., Ex. A-7, 67–68 [32].

subcontract and admitting Hunt held $273,716.25 in unpaid balance under that subcontract). Contrary to Berkley's contention, the fact that Weir Bros. potentially may be prevented from accessing the funds because it has not satisfied all contractual conditions precedent to payment does not negate Weir Bros.'s property interest in the account.[6] Neither Texas's codification of the UCC nor caselaw interpreting Texas statutes suggest that property rights are lost by virtue of contractual preconditions on payment.[7] TEX. BUS. & COMM. CODE § 9.102(a)(2) (defining a debtor's account as "*a right to payment* . . . whether or not earned by performance" "*for services rendered*") (emphasis added); *see Tex. Oil & Gas* at 1047. The Court thus finds that Weir Bros. had property rights in the interpled funds — withheld payments and retainage for services it rendered — regardless of whether it could contractually access its right to payment at the time the funds were interpled.

Because Weir Bros. had property rights recognized by Texas law, the Court next inquires as to whether these rights constitute "property or rights to property" within the meaning of the federal tax statute. A federal tax lien attaches at the time the IRS assesses unpaid taxes to "all property and rights to property" belonging to a debtor, including after-acquired property. 26 U.S.C. §§ 6321–6322; *see Tex. Comm. Bank–Ft. Worth, N.A. v.*

---

[6] At the time of the garnishment action, Weir Bros. had not provided Hunt with final releases and related documents that were contractual preconditions to Hunt making the final payment to Weir Bros. Hunt's First Am. Interpleader Petition 1–2 [1.2]

[7] This is also true for purposes of the federal law. *See Whiting-Turner/ A.L. Johnson v. P.D.H. Development, Inc.*, 184 F. Supp. 2d 1368, 1376 (M.D. Ga. 2000) (finding an account existed "because [the debtor] had earned by performance a right to payment," regardless of "the conditional nature of this right to payment under the Subcontract").

*United States*, 896 F.2d 152, 161 (5th Cir. 1990). Accounts receivable constitute "rights to property" within the scope of the federal tax code. *See Tex. Oil & Gas Corp.*, 466 F.2d at 1051–53 (holding the IRS's tax lien had priority in debtor's accounts receivable where accounts came into existence more than forty-five days after the IRS filed its lien notice); *see also Tex. Comm. Bank–Ft. Worth, N.A.*, 896 F.2d at 162 (holding federal tax lien had priority interest in debtor's accounts). Consequently, the interpled funds are "property or rights to property" to which the IRS's tax lien may attach.

Federal tax liens are not enforceable against a debtor's secured creditors, however, unless the IRS has perfected its interest by filing notice of its lien in accordance with the requirements of the state in which the property resides. [8] 26 U.S.C. § 6323(a), (f). Under the applicable Texas statute, the IRS must file a notice of lien with the Texas Secretary of State. Tex. Bus. & Comm. Code § 9.501(a)(2). Here, the record shows that between August 2011 and July 2012, the IRS conducted five assessments finding a total of $901,101.24 in unpaid taxes against Weir Bros. U.S.' Mot. Summary Judgment 5 [24]. Upon assessment, a federal tax lien for the assessed amount attached to all Weir Bros.'s property and rights to property — including the Hunt account receivable once services were rendered and that account came into existence. The IRS perfected its lien for

---

[8] The IRS lien attached to the assets of Weir Bros., which was a Texas corporation. Pet. in Intervention 2 [1.9]. Because there is no evidence that it had offices in other states, its location is Texas. *See* Tex. Bus. & Comm. Code § 9.307(b)(2)–(3), (d). Likewise, the Hunt account receivable is owed for work Weir Bros. performed on the University Hospital for the University of Texas Southwestern Medical Center, a construction project located in Dallas, Texas. Pineda Mot. Summay Judgment Brief 9 [28].

$901,101.24 by properly filing notice with the Texas Secretary of State on December 10, 2012.  U.S.' Mot. Summary Judgment Appx., Ex. 3, 59 [26].

The only remaining issue is whether this perfected tax lien has priority in the interpled funds as against Weir Bros.'s creditors.  In determining the priority of federal tax liens, "the basic priority rule of 'first in time, first in right' controls, unless Congress has created a different priority rule to govern the particular situation."  *Tex. Comm. Bank–Ft. Worth, N.A.*, 896 F.2d at 161.  When the IRS has a federal tax lien and a creditor has an interest in a debtor's after-acquired property, both interests attach once the property exists and the debtor gains rights in it.  The Supreme Court has determined that within the context of the federal tax code, the "first-in-time" rule grants the IRS priority in such cases of simultaneous attachment, even if the creditor filed notice of its interest prior to the date that the IRS assessed the tax lien and filed notice.  *United States v. McDermott*, 507 U.S. 447, 454–55 (1993).  The tax code does make some exceptions to this general rule, however.

Relevant to this case, the special priority rules of section 6323(c) provide that a security interest[9] "in *qualified property* covered by the terms of a written agreement entered before tax lien filing and constituting a commercial transactions financing agreement" that is "protected under local law against a judgment lien" arising out of an unsecured

---

[9] Section 6323(h)(1) defines "security interest" as "any interest in property acquired by contract for the purpose of securing payment or performance of an obligation or indemnifying against loss or liability."  26 U.S. C. § 6323(h)(1).  The Fifth Circuit has observed that "section 6323(c)(1) appears to have qualified that general definition" to allow interest in collateral acquired after the creditor's filing because "section 6323(c) by its terms contemplates certain limited types of property acquired after the point-in-time reference."  *Tex. Oil & Gas Corp.*, 466 F.2d at 1047.

obligation shall take priority over a federal tax lien. 26 U.S.C. § 6323(c)(1)(A)(i), (B) (emphasis added). Collateral constitutes "qualified property," however, only if it was "acquired by the taxpayer before the 46th day after the date of tax lien filing." *Id.* at § 6323(c)(2)(B); *Tex. Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1049 (5th Cir. 1972).

The record shows that Pineda has a security interest because a written commercial financing agreement was executed, notice was filed, and loans were made prior to the date the IRS filed its first tax lien against Weir Bros. Pineda Mot. Summary Judgment Appx., 17, 29 [29.2] 67–72 [29.3]; 339–50 [29.30]. As conceded by the IRS and discussed below, Pineda as a secured creditor has priority to $134,063.25 of the interpled funds, which constitute "qualified property" earned by Weir Bros. prior to or during the forty-five-day period following the IRS's filing of its 2012 tax lien. Evidence proffered by Hunt reveals that $139,653.00 of the funds in the account receivable accrued on or after January 25, 2013, the forty-sixth day after the IRS filed notice of the tax lien. Pineda Mot. Summary Judgment Appx., 378–79 [29.32]. Consequently, the Court finds that the IRS has priority in those funds, even under section 6323's protections for creditors

The IRS has priority over Berkley in all the interpled funds because Berkley is a judgment lien creditor.[10] The tax code makes no exceptions to the general priority rule for unsecured creditors like Berkley. Even if Berkley's November 2013 judgment had been

---

[10] The Court rejects Berkley's trust fund theory and declines to read Berkley's GIA as creating an express trust and granting Berkley equitable rights in the interpled funds, as discussed in detail below. Berkley has also admitted that it is not claiming the funds based on secured creditor status. Berkley's Resp. Brief Pineda's Mot. Summary Judgment 17–18 [43].

obtained prior to the IRS's assessment and notice filing, Berkley's interest could not have attached to the accounts-receivable until the IRS's lien attached — at the moment Weir Bros. gained rights in the account. As stated above, the general first-in-time priority rule would favor the IRS in such a case. Accordingly, the Court finds that the IRS's tax lien has priority in $139,653.00 of the interpled funds as against all the parties to this action and is subsequent to Pineda's security interest in the remaining $134,063.25 of the funds.

### B. Pineda's UCC-1 Security Interest Has Priority in $134,063.25 of The Funds

The Court holds that Pineda has priority over all other parties to this action as to $134,063.25 of the interpled funds, subject to Hunt's reasonable attorneys' fees. Pineda's priority is dependent on its claim to a perfected UCC-1 security interest,[11] which the Court holds it has successfully shown.

Under Texas law, to establish a perfected security interest a party must prove both that the interest has attached to the collateral and that the party has properly perfected its interest against other parties. TEX. BUS. & COMM. CODE §§ 9.203, 9.301(A). Attachment occurs once the security interest is enforceable against the debtor. *Id.* at § 9.203(a). For a security interest to be enforceable with respect to collateral, (1) there must be value given;

---

[11] Berkley seems to suggest that Pineda has only a "garnishment lien" that arose in November 2017 when it filed the garnishment writ against Hunt. Berkley's Mot. Summary Judgment Brief 16 [22]. This is incorrect. Garnishment proceedings are simply a procedure by which a creditor may recover from a debtor's funds that are held by a third party pursuant to a preexisting interest or lien against the debtor. *Nat'l City Bank v. Tex. Capital Bank, N.A.*, 353 S.W.3d 581, 584 (Tex. App. — Dallas Nov. 23, 2011, no pet.) ("Garnishment is a statutory proceeding whereby property of the debtor that is in possession of the garnishee is applied to the payment of the debt owed by the debtor to the garnishor.") (internal quotations omitted).

(2) the debtor must have rights in the collateral; and (3) the debtor must have authenticated a security agreement with a description of the collateral. *Id.* at § 9.203(b)(1), (2), (3)(A). A security agreement "may create or provide for a security interest in after-acquired collateral," but that interest will not attach until the debtor acquires the collateral. *Id.* at § 9.204(a), cmt. 2. To perfect an interest in accounts receivable, a financing statement containing the names of the debtor and secured party and indicating the collateral generally must be filed. *Id.* at §§ 9.310(a); 9.502. No further action is required to perfect an interest in after-acquired accounts receivable. *Id.* at § 9.204 cmt. 2.

Here, the record establishes that the original assignor of Pineda's security interest, Compass Bank, executed a security agreement with Weir Bros. which granted the Bank an interest in all Weir Bros.'s accounts receivable to secure a revolving line of credit. Pineda Mot. Summary Judgment Appx. 14–66 [29.2]. The Bank advanced $4,000,000.00 that Weir Bros. did not repay by its May 31, 2012, maturity date. *Id.* at 245–47 [29.23]. On October 9, 2008, the Bank also perfected the security interest by properly filing notice with the Secretary of State. *Id.* at 339–43 [29.30]. This security interest attached to the interpled funds as soon as Weir Bros. gained rights in that account — once the funds were due for Weir Bros.'s services rendered — without further action by the Bank or Pineda. TEX. BUS. & COMM. CODE §§ 9.308(a); 9.204, cmt. 2. Pineda has also shown that this security interest was assigned to it through a series of assignments[12] and that it properly filed amendments

---

[12] *See* Pineda Mot. Summary Judgment Appx. 146–54 [29.10], 168–77 [29.13], 199–206 [29.17], 227–36 [29.21].

to the UCC-1 filing with the Secretary of State to reflect assignment of the security interest and to continue the interest.[13]

Under section 6323(c)'s special priority rules for secured creditors, Pineda has priority over the IRS as to $134,063.25 of the funds. The security interest Pineda now holds arose in 2008, four years before the IRS filed its notice of its tax lien. Evidence provided by Hunt also shows that Weir Bros. earned $134,063.25, in withheld payments and retainage, prior to or on January 24, 2013, the forty-fifth day after the IRS filed notice of the tax lien. Pineda Mot. Summary Judgment Appx., 378–79 [29.32]. Because both Pineda's security interest was perfected and Weir Bros. gained property rights in the relevant collateral prior to the end of the forty-five-day window, the Court finds that Pineda has priority over the IRS in this portion of the funds. As discussed above, the IRS has priority over Pineda in the remaining $139,653.00 of the interpled funds that Weir Bros. acquired on or after the forty-sixth day after the IRS filed notice of the tax lien.

Pineda's security interest is also superior to Berkley's interest as a judgment lien creditor. Berkley's challenges to Pineda's priority in the funds are largely predicated on Berkley having a valid trust right to the funds that would preclude attachment of a security interest — but as discussed below, Berkley has not shown the existence of a valid express trust. Further, Berkley did not properly file and perfect a security interest and admits that its claim to the interpled funds is based on its express trust theory rather than secured

---

[13] *Id.* at 345–50 [29.30]; 360 [29.31].

creditor status.[14]   Accordingly, Berkley is a judgment lien creditor pursuant to its

November 2013 judgment.  Texas law on lien priority dictates that secured creditors like

Pineda have priority in collateral over subsequent judgment lien creditors like Berkley.

TEX. BUS & COMM. CODE § 9.317(a)(2).  The Court thus grants Pineda summary judgment

and finds it is entitled to $134,063.25 of the interpled funds, subject to Hunt's reasonable

attorneys' fees in the amount of $3,691.03.

## IV.  THE COURT DENIES BERKLEY'S AND WEIR'S MOTIONS FOR SUMMARY JUDGMENT

Because the Court finds that the IRS and Pineda are entitled to the entirety of the

interpled funds, it denies Berkley's motion for summary judgment.  The Court also denies

the Weir Group's motion for summary judgment because its rights were acquired from

Weir Bros. subject to the IRS and Pineda's interests in Weir Bros.'s collateral and because

it has not proven its claims for wrongful garnishment or attorneys' fees.

### A.  Berkley Does Not Have Priority Over the IRS' Tax Lien or Pineda's Security Interest

Berkley claims that it has an equitable interest in the interpled funds that trumps all

other interests in the funds, including both the IRS's tax lien and Pineda's security interest.

This argument is premised on a series of conclusions: that the general indemnity agreement

---

[14] Berkley's UCC filing was improper because it misspelled the debtor's name such that a records search would not return its filing statement.  TEX. BUS & COMM. CODE §§ 9.502(a); 9.503(a)(1); 9.506(a)–(c); Pineda Mot. Summary Judgment Appx., 351–76 [29.31]; 527– 33 [29.43].  Consequently, Berkley did not perfect any security interest that the GIA, construed as a security agreement, may have granted it.

("GIA") created a valid trust;[15] that the trust rights are an equitable ownership interest superior even to earlier-filed and perfected security interests and federal tax liens; and that Berkley is entitled to any property rights created. The Court finds that Berkley has not established the first of these necessary steps — the existence of a valid express trust.

To establish an express trust, Texas trust law requires that "the settlor manifests an intention to create a trust" and that the beneficiary and trust *res* are identified.[16] TEX. PROP. CODE §§ 111.004(4), 112.001–002; *Pickelner v. Adler*, 229 S.W.3d 516, 526 (Tex. App. – Houston [1st] June 28, 2007, pet denied). The Fifth Circuit has held, however, that mere formulaic recitations of trust language are insufficient to create an express trust. *In re Sakowitz, Inc.*, 949 F.2d 178, 181 (5th Cir. 1991) ("It is well established that if a ritualistic

---

[15] Berkley's claim to an express trust is based entirely on Section VII of the GIA, which states:

> The Indemnitors [Weir Bros.] agree and hereby expressly declare that all funds due or to become due under any Contract covered by a Bond are Trust Funds, whether in the possession of an Indemnitor or another, for the benefit and payment of all persons to whom the Indemnitor incurs obligations in the performance of a Contract for which the Surety [Berkley] would be liable under the Bond and for the benefit of Surety for any liability or loss it may sustain or incur by reason of or in consequence of the execution of such Bonds. Upon notice from the Surety to an Obligee, Indemnitors hereby authorize and direct the Obligee of any such Bond to pay to the Surety any and all funds due or to become due on any Contract bonded by Surety, and upon payment of such funds, the Obligee is released and discharged from any and all liability to Indemnitors in connection with the payment.

[16] Pineda presses the argument that the Texas Construction Trust Fund Act ("TCTFA") precludes sureties from being beneficiaries of express trusts of construction contract funds. The Court declines to address the merits of that interpretation here because Berkley has not established the existence of an express trust. Consequently, whether the TCTFA preempts such trusts is immaterial.

incantation of trust language were deemed conclusive, it would be a simple matter for one creditor, at the expense of others, to circumvent the rules pertaining to the creation of bona fide security interests.") (internal quotation marks omitted); *Hart v. First Nat'l Bank of Birmingham, Ala.*, 373 F.2d 202, 206 (5th Cir. 1967) ("These distinguishing points show that this agreement did not create a trust, as its most salient features place it on the mortgage side . . . . One cannot become a refugee from the statute of limitations by calling a transaction a trust.").

In *Sakowitz*, the Fifth Circuit determined that parties to a sublease agreement that used trust language could not thereby convert what was facially and functionally a sublease into a trust in order to gain trust beneficiary protections and defeat secured creditors. *Sakowitz, Inc.*, 949 F.2d at 181–83. The Court observed that aspects of the agreement as a whole — such as the fact that one party bore a credit risk and that the alleged beneficiary could not access the supposed trust property on demand — showed that it was not a trust document and that the parties did not truly intend to create a trust. *Id.* at 183.

Similarly, the agreement here has all the hallmarks of a security agreement rather than a trust. The GIA is self-styled an "agreement of indemnity" and purports to provide a "grant of security interest" in accounts and all contract retainage and withheld payments in exchange for surety bonds. Pineda's Mot. Summary Judgment Appx., 586–87 [29.46]. Like a creditor, Berkley's ability to access the accounts receivable is only permitted "upon the occurrence of an Event of Default," and Weir Bros. is liable to Berkley for defaults under the GIA even in the absence of any available accounts receivable — the alleged trust *res*. *Id.* at 586, 588. Throughout the document, the GIA consistently refers to Berkley as

a "secured party" with a "security interest" and to the accounts receivable as "collateral." *Id.* at 586–88, 590. One use of the phrase "trust funds" — in reference to the same receivables previously declared "collateral" for a "security interest" — does not contravene the multiple indicia that the GIA is a security agreement. *See In re Mejorado*, 605 B.R. 116, 124 (Bankr. N.D. Tex. 2019) ("Mere recitals in a document that an obligation is 'in trust' alone will not establish a fiduciary relationship.").

Further evidence that the GIA was not intended to form a trust is seen by what is absent from the document. Neither the section advancing the trust theory nor any other section clearly designates a trustee or beneficiary — in fact, neither those terms nor "grantor" are used at all.[17] Rather, Section VII states that all funds due under a contract, "whether in the possession of [Weir Bros.] or another," are trust funds. It also states that such funds are "*for the benefit of **all persons** to whom [Weir Bros.] incurs obligations in the performance of a Contract for which the Surety would be liable under the Bond **and for the benefit of Surety**.*" Pineda's Mot. Summary Judgment Appx., GIA 588 [29.46]. (emphasis added). This language is ambiguous and seems just as likely to make Weir Bros.'s materialmen or suppliers trust beneficiaries as Berkley.

---

[17] While "technical words of expression are not essential for the creation of a trust," the absence of key trust terms such as "grantor," "trustee," and "beneficiary" can be significant. *See Sarah v. Primarily Primates, Inc.*, 255 S.W.3d 132, 144–46 (Tex. App. – – San Antonio Jan. 16, 2008, pet. denied) (emphasizing the use of words like "transfer" and "ownership" rather than "trustee," "beneficiary," and "grantor" in finding there was no clear intent in the contract to create a trust).

Here, the GIA taken in its entirety belies Berkley's assertion that the parties intended to create a trust. The GIA suggests instead that the parties intended to create a creditor-debtor relationship and security interest but sought to bake in trust beneficiary protections by a singular use of the phrase "trust funds." The Court declines to allow the parties to circumvent the priority schemes of the federal tax code and the UCC by mere recitation of the words "trust funds." Because the Court finds that the parties did not intend to create an express trust, Berkley has only the rights of a judgment lien creditor pursuant to its November 2013 judgment.

The federal statutory provision permitting exceptions to federal tax lien priority does not make an exception for judgment lien creditors like Berkley. *See* 26 U.S.C. § 6323. Under Texas's codification of the UCC, judgement lien creditors also do not have a superior interest to secured creditors like Pineda. TEX. BUS & COMM. CODE § 9.317(a)(2). The Court thus finds that Berkley's interest is inferior to both the IRS's tax lien and Pineda's security interest and denies Berkley's motion for summary judgment.

### B. The Weir Group's Interest in the Funds is Not Superior to that of Pineda and the IRS, and Its Improper Garnishment and Attorneys' Fees Claims Fail

Weir Contracting, LLC and Al Weir, as trustee for the Weir Liquidating Group, (collectively, the "Weir Group") intervened in this action asserting a claim to the entirety of the interpled funds on behalf of the IRS,[18] a claim for wrongful garnishment against Pineda, and a claim against Pineda and Berkley for attorneys' fees. The Weir Group also

---

[18] The IRS claims it does not have priority to the entirety of the interpled funds and agrees with Pineda that it has priority as to only $139,653.00. U.S.' Mot. Summary Judgment 25–26 [24].

asserts a related claim for declaratory relief and seek a declaration that Weir Contracting, LLC ("Contracting") owns the interpled funds, that Contracting is obligated to tender them to the Trust, and that the IRS is the proper creditor to receive the funds from the Trust. The Court denies the Weir Group's motion for summary judgment and grants judgment to Pineda as against all the Weir Group's claims.

The Weir Group's claim to the interpled funds and related claim for declaratory relief rest on its assertion that it owns all Weir Bros.'s former assets, including the Hunt account receivable. Specifically, the Weir Group argues that Contracting acquired all Weir Bros.' assets, including the Hunt contract account receivable, pursuant to the Purchasing Agreement executed by Contracting and Weir Bros. on December 4, 2013. This argument is insufficient to overcome Pineda's priority in $134,063.25 of the funds because when the Weir Group acquired Weir Bros.'s assets, it did so subject to any outstanding security interests in those assets. Pineda predecessor-in-interest obtained its security interest via security agreement and properly filed by October 9, 2008 — years prior to the Weir Group's acquisition of Weir Bros.'s assets and obligations — and its interest attached the moment the account receivable came into existence.[19] The Weir Group cannot have greater rights than Weir Bros. could grant. S*ee Nat'l City Bank v. Tex. Capital Bank, N.A.*, 353

---

[19] As explained above, the Court finds that the accounts existed, and Weir Bros. had rights to the accounts, once "services were rendered and the debt became owing." *Tex Oil & Gas Corp.*, 466 F.2d at 1050 (holding that, because debtor had not yet rendered services prior to the expiration of the forty-five-day window after the IRS filed notice of the tax lien, the account receivable did not exist prior to perfection of the federal tax lien). Texas law focuses on whether money is owed for services rendered, not whether a contractual precondition to payment bars a debtor's immediate access to funds earned.

S.W.3d 581, 5 (Tex. App. — Dallas Nov. 23, 2011, no pet.) (explaining that a party "subrogated to the rights of the debtor" may not "acquire any greater rights" than those the debtor possessed). Weir Bros. had rights to the account receivable subject to Pineda's security interest, which is what the Weir Group now has.

Similarly, the Weir Group's reliance on a state court judgment, finding that it has these assets subject to the IRS's priority interest, is unavailing. That judgment does not appear to resolve Pineda's rights to the Weir Bros. collateral acquired by the Weir Group, and the Weir Group has not shown that either Pineda or its predecessor-in-interest, Compass Bank, were parties to that judgment and bound by it. Further, that judgment expressly found that the Weir Group acquired Weir Bros.'s assets subject to any valid and perfected liens. Weir Group's Mot. Summary Judgment, Ex. A-1, 3 [34]. This Court holds that Pineda's interest was a preexisting lien and that the Weir Group took Weir Bros.'s assets subject to it.

The Weir Group's ownership rights are also subject to the IRS's federal tax lien as to the remaining $139,653.00 of the funds for the same reasons that the Weir Group is subject to Pineda's interest. The IRS assessed unpaid taxes and filed its notice of lien on December 10, 2012. It attached immediately once the account came into existence, and the Weir Group takes the account subject to the tax lien with which it is impressed. The IRS is thus entitled to direct payment of the funds.

The Weir Group also alleged an improper garnishment claim, asserting Pineda "wrongfully garnished accounts that do not belong to the judgment debtor," and a claim for attorneys' fees against Pineda and Berkley. Pet. in Intervention 5–6 [1.9]. Although

the Weir Group does not pursue these claims in its motion for summary judgment, Pineda seeks judgment on them. The Court finds that the Weir Group has made no showing that Pineda's garnishment writ was improper or explained why it should be awarded fees against Pineda or Berkley. The Court thus denies these claims and grants Pineda's request for judgment on them.

## V. THE COURT GRANTS IN PART AND DENIES IN PART HUNT'S MOTION FOR SUMMARY JUDGMENT

The Court grants in part and denies in part Hunt's motion for summary judgment seeking $23,556.71 in attorneys' fees because Hunt is entitled to attorneys' fees related to answering the garnishment writ and interpleading the funds but not for its involvement in this case after filing interpleader. State law governs "both the award of and the reasonableness of fees awarded" in a state garnishment proceeding removed to federal court unless a conflicting federal law applies. *See Walker Int'l Holdings, Ltd. v. Republic of Congo*, 415 F.3d 413, 416–17 (5th Cir. 2005). Texas Rule of Civil Procedure 677 provides as follows:

> Where the garnishee is discharged upon his answer, the costs of the proceeding, including a reasonable compensation to the garnishee, shall be taxed against the plaintiff; where the answer of the garnishee has not been controverted and the garnishee is held thereon, such costs shall be taxed against the defendant and included in the execution provided for in this section; where the answer is contested, the costs shall abide the issue of such contest.

TEX. R. CIV. P. RULE 677. While "the term 'costs' has consistently been interpreted to include attorney's fees," courts have varied in their interpretation of the three categories outlined in Rule 677. *Weisbrod, Matteis & Copley, PLLC v. Manley Toys, Ltd.*, 2015 WL

7771075, at *5 (N.D. Tex. 2015); *see Rowley v. Lake Area Nat'l Bank*, 976 S.W.2d 715, 722 (Tex. App — Houston [1st] Feb. 19, 1998, pet. denied) (observing the "[c]onfused [j]urisprudence" under Rule 677). Both Texas state and federal courts have acknowledged, however, the principle that determinations of reasonable fees are within the broad discretion of the trial court. *Walker Int'l Holdings, Ltd.*, 415 F.3d at 418 ("In garnishment cases, as is generally the case, the amount of an award of attorney's fees rests in the sound discretion of the trial court.") (internal quotation omitted); *Weisbrod, Matteis & Copley, PLLC*, 2015 WL 7771075, at *6; *Rowley*, 976 S.W.2d at 724.

Here, the Court finds that Hunt did not contest that it held an unpaid balance under its subcontract with Weir Bros. and should be compensated for the costs of responding to the writ of garnishment and filing its answer, counterclaims, and interpleader action. *See Weisbrod, Matteis & Copley, PLLC*, 2015 WL 7771075, at *6 ("It is the policy of the rules regarding garnishments to compensate a garnishee who either prevails in a contest or does not contest its debt."). The Court disagrees with Hunt, however, that fees incurred for its involvement in the case beyond this point were reasonable. Hunt argues that it should receive fees incurred in reviewing and responding to other parties' motions, discovery, and disclosures and that it could not have sought dismissal and fees earlier in the case because it was unclear until the close of discovery that the IRS would not seek the entirety of the funds.

The Court finds this argument unpersuasive. A garnishee is not required to wait to seek dismissal and fees until it appears clear to the garnishee that it may be able to receive fees. Even if that were the case, the remaining parties do not unanimously agree that the

IRS may not recover all the funds — the Weir Group asks this Court to award all the interpled funds to the IRS. Because the Court finds that the fees incurred in responding to the writ of garnishment and filing Hunt's answer, counterclaims, and interpleader action were reasonable, it awards the $3,691.03 in associated fees. Hunt Mot. Summary Judgment Appx., Ex. A-1 012–013 [32]; Pineda's Resp. Brief 14 [52]. These fees shall be recovered from the portion of the interpled funds that Pineda is entitled to receive and shall not affect the interpled funds to which the IRS has priority.[20] The Court denies the remaining $19,865.68 in fees sought because Hunt could have avoided these expenses by seeking dismissal and fees earlier in this case. The Court does not criticize Hunt and its counsel's choice to continue litigating. The Court is unwilling, however, to make Pineda pay for Hunt's choice.

## CONCLUSION

The Court grants the IRS's motion for summary judgment and holds it is entitled to $139,653.00 of the interpled funds. The Court also grants Pineda's motion for summary judgment and holds it is entitled to $134,063.25 of the interpled funds, subject to Hunt's attorneys' fees in the amount of $3,691.03. The Court denies Berkley's motion for summary judgment because the IRS and Pineda have priority in the interpled funds. The Court denies the Weir Group's motion for summary judgment because the IRS and Pineda

---

[20] A garnishee may not recover fees from the funds if doing so would reduce the amount of funds the IRS would otherwise be entitled to receive. *Spinks v. Jones*, 499 F.2d 339, 340 (5th Cir. 1974) ("The stakeholder of an interpleaded fund is not entitled to attorney's fees to the extent that they are payable out of a part of the fund impressed with a federal tax lien.").

have priority in the interpled funds and because the Weir Group has not established its claims for wrongful garnishment or attorneys' fees. The Court grants in part and denies in part Hunt's motion for summary judgment because Hunt is entitled to fees only for the $3,691.03 in costs incurred in answering the garnishment writ and interpleading the funds. Hunt's fees will be subtracted from the portion of funds to which Pineda is entitled and may not be paid from the IRS's portion of the funds. Hunt is not liable to any party for any amount beyond the $273,716.25 of interpled funds.

Signed March 12, 2020.

David C. Godbey
United States District Judge